**Opinion issued December 15, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00537-CV

————————————

## IN THE INTEREST OF K.R.G. AND K.W.G., CHILDREN

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2015-04151J

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, K.G., challenges the trial court's order, entered after a bench trial, terminating his parental rights to his minor children, K.R.G. and K.W.G.[2]  In three issues, K.G. contends that the evidence is legally and

---

[1]  *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

[2]  The mother of K.R.G. and K.W.G. does not appeal the termination of her parental rights.

factually insufficient to support the trial court's findings that he engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being,[3] he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children,[4] and termination of his parental rights is in the best interest of the children.[5]

We affirm.

## Background

On July 9, 2015, the Texas Department of Family and Protective Services ("DFPS") filed a petition seeking managing conservatorship and termination of K.G.'s parental rights to his minor children, K.R.G. and K.W.G.[6]  By affidavit attached to the petition, DFPS Investigator April Jones testified[7] that on May 22, 2015, DFPS received a report that G.G., the mother of K.R.G. and K.W.G., had arrived at a hospital because of issues relating to her pregnancy with K.W.G.  At that time, G.G. had scars on her face caused by "domestic altercations" between herself

---

[3]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (Vernon Supp. 2016).

[4]     *See id.* § 161.001(b)(1)(O).

[5]     *See id.* § 161.001(b)(2).

[6]     On June 3, 2016, DFPS filed its first amended petition also seeking managing conservatorship and termination of K.G.'s parental rights.  At the time of trial, K.R.G. was three years old and K.W.G. was eleven months old.

[7]     At trial, the trial court admitted Jones's affidavit into evidence.

and K.G. The report also alleged that the home of G.G. and K.G. was unsafe, contained bed bugs, and had little or no food; G.G. had a history of alcohol abuse; K.G. had a history of narcotics use; and K.G. was "on probation for possession of crack" cocaine.

Jones further testified that during DFPS's investigation of the family, G.G. admitted that domestic violence had occurred between herself and K.G. and K.G. had hit her, including while she was pregnant. Although K.G. denied domestic violence in the home, he did admit to a verbal altercation with G.G., during which "he accidentally hit her with a bucket." G.G. also reported to DFPS that there was no food in home. And Jones noted that another DFPS Investigator, Shemika Peoples, characterized the family's home as "very dirty" and infested with bed bugs and maggots.

Jones explained that on July 8, 2015, when she arrived at K.G.'s home,[8] it was "trashed." "[T]he blinds [were] completely torn off of the window, trash was near the door of the home, clothing was scattered around in piles, dirty dishes were in the sink, and there were small blood splatters on the floor." K.G. blamed the "mess" on G.G. G.G. told Jones that she had arrived at the home the night before with the children and she and K.G. began to argue. Although G.G. could not remember what

---

[8] From the record, it appears that at some point G.G. and K.G. stopped living together, and by July 8, 2015, K.G. had obtained a new apartment.

had happened, Jones observed that G.G. had "multiple bruises on her upper and lower arms that appeared fresh," "multiple scratches on her face[,] and a large laceration on [her] right cheek." K.G. also had scratches on his neck. That day, DFPS took the children into custody.

At trial, DFPS caseworker Mark Waters testified that DFPS took K.R.G. and K.W.G. into custody after G.G. had arrived at the hospital because of complications related to her pregnancy with K.W.G. At the time, G.G. had "bruising on her face," which she stated was the result of domestic violence in the family's home. K.G. physically abused G.G., hit her, and had a "drug problem." The physical abuse and narcotics use by K.G. had occurred throughout G.G.'s entire relationship with him. And an investigation by DFPS into the family's living conditions revealed that their home was not sanitary. It was infected with bed bugs and had maggots "running around on [its] floor[s]."

Waters further testified that although DFPS had given K.G. a Family Service Plan ("FSP"), he had not completed all of the required services. At the time of trial, K.G. had not completed substance-abuse counseling, domestic-violence training, or anger-management classes.[9] However, Waters did note that K.G. had submitted to

---

[9] Waters noted that K.G. had been "unsuccessfully discharged" from his domestic-violence training and anger-management classes because he had missed too many sessions and had not paid for them.

a psychosocial examination, completed a psychiatric examination, submitted to a substance-abuse assessment, and attended parenting classes.

Waters explained that during the pendency of the instant case, K.G. had tested positive for the use of "K2 slash spice"[10] in August and September 2015; "K2 spice" and cocaine on October 27, 2015; marijuana, amphetamines, and methamphetamines on March 1, 2016; and benzodiazepine on March 30, 2016.[11] And Waters noted that K.G. had a criminal record, which included multiple convictions for committing the offenses of delivery of a controlled substance and possession of cocaine.[12]

---

[10]    "K2" or "spice" constitutes synthetic marijuana or a synthetic cannabinoid. *See In re E.M.*, 494 S.W.3d 209, 223 n.2 (Tex. App.—Waco 2015, pet. denied) ("K2 is a commonly used name for synthetic marijuana, a controlled substance that is unlawful to possess."); *In re Z.M.*, 456 S.W.3d 677, 682 n.4 (Tex. App.—Texarkana 2015, no pet.) ("K2 is a synthetic cannabinoid drug that has a hallucinogenic effect when smoked."); *Strambler v. State*, No. 14-11-01090-CR, 2013 WL 160430, at *1 (Tex. App.—Houston [14th Dist.] Jan. 15, 2013, no pet.) (mem. op.) ("K2 Spice" constitutes "a synthetic cannabinoid").

[11]    The trial court also admitted into evidence K.G.'s narcotics-test results, revealing that he tested positive for the use of "K2 Spice," benzodiazepines, alprazolam metabolite, and marijuana in September 2015; benzoylecgonine, cocaine, marijuana, amphetamine, and methamphetamine in December 2015; and marijuana in March 2016.

[12]    The trial court admitted evidence of K.G.'s criminal record, revealing that on January 12, 1999, he was convicted of committing the felony offense of delivery of a controlled substance, namely cocaine, weighing less than one gram, and sentenced to confinement for one year; on July 13, 2010, he was convicted of committing the felony offense of possession of a controlled substance, namely cocaine, weighing more than four grams but less than 200 grams, and sentenced to confinement for two years; and on April 4, 2011, he was convicted of committing the felony offense of delivery of a controlled substance, namely cocaine, weighing less than one gram, and sentenced to confinement for two years. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.112(a)–(b), 481.115(a), (d) (Vernon 2010).

In regard to the children's current placement, Waters testified that K.R.G. and K.W.G. have been together in an adoptive foster home since August 2015. The children have bonded with their foster parents, who would like to adopt them. During the pendency of the instant case, K.G. attended visits with the children; however, "backlash" from K.R.G. would occur after his visits with his father. Specifically, K.R.G. would "act[] out," exhibit "unexplained conduct" that had not occurred prior to his visits with K.G., and have "[a]nger outbursts."

Waters opined that it would be in the children's best interest for K.G.'s parental rights to be terminated because he had not completed the services required by his FSP, narcotics use continued to be an issue for him, and G.G. and K.G. had not demonstrated an ability to cease the "domestic violence issues" that occurred between them. Further, Waters noted that the children were in need of permanency, which up to that point they had been lacking.

Linda Plummer, a volunteer for Child Advocates Inc. ("Child Advocates"), testified that the termination of K.G.'s parental rights would be in the children's best interest. She explained that K.R.G. and K.W.G. are thriving with their foster parents,

Further, although the case was ultimately dismissed, a Harris County grand jury, on May 18, 2010, issued a true bill of indictment, accusing K.G. of unlawful possession of a firearm by a felon. *See* TEX. PENAL CODE ANN. § 46.04(a), (e) (Vernon 2011). And Jones, by affidavit, testified that K.G. was also convicted of committing the misdemeanor offense of evading arrest on January 27, 2004 and the felony offense of delivery of a controlled substance on July 9, 2007. *See* TEX. PENAL CODE ANN. § 38.04(a)–(b) (Vernon Supp. 2016) (evading arrest).

6

the foster-home environment is "[v]ery positive," and the children's foster parents would like to adopt them. Further, since K.R.G. and K.W.G. began living with their foster parents, their behavior had improved.

G.G. testified that K.G. is abusive toward her, he had previously broken her arm, and she has "a lot of scars on [her] face and bruises." K.G. first hit G.G. when she was pregnant with K.R.G., and the abuse continued until DFPS took custody of the children. G.G. explained that she could not leave the home that she had shared with K.G. because "[h]e told [her that] he would kill [her], find [her] and kill [her]." G.G. also noted that K.G. began using "K2 or spice" in 2011, he continued to use narcotics throughout their entire relationship, and his narcotics use had become "worse[] and worse[]" over time.

The trial court admitted into evidence the medical records from G.G.'s hospital visit. The records reveal that G.G. arrived at the hospital pregnant and complaining of nausea and vomiting. She identified K.G. as her "domestic partner," with whom she had lived for more than three years. As early as six months into their relationship, K.G. began physically and verbally abusing G.G. And she had sustained scars as a result of the abuse, which occurred daily. For instance, K.G. had previously "head-butted [G.G.] in the face, causing her lip to split open." He screamed and cursed at K.R.G. And "hoard[ed]" the little food that was in the family's home for himself. In order to feed herself and K.R.G., G.G. would take

7

K.R.G. to her mother's house so that he could "relax and eat before [she would] tak[e] him back to [the] hell hole." (Internal quotations omitted). G.G. also noted that the family's home had been infested with bed bugs for two years. And K.G., at the time, was "on probation for possession of crack" cocaine.

The Children's Crisis Care Center (the "CCCC") "Family Evaluation," which the trial court admitted into evidence, reveals that according to G.G., K.G. had been physically and verbally abusive toward her.[13] He had broken her arm, "head-butted her," "threatened to kill her," and "choke[d] her until she couldn't breathe." The first time that K.G. slapped G.G. occurred after they had been together for one year because he did not want her to "go out with her friends." He then became "more and more physically abusive, hitting [G.G.] about every other day with a hair comb or whatever else." K.G. was also controlling and would not allow G.G. to eat certain foods. From G.G.'s perspective, K.G. seemed to hate her, and she was afraid of him. G.G. also noted that K.G. had previously "left a mark" on K.R.G.'s back.

The Family Evaluation further reflects that G.G. and K.G. had lived together for three years, and he had four other children with whom he was not involved. According to G.G., K.G., during their relationship, had used synthetic marijuana and ecstasy, and he had sold narcotics. He would become angry with G.G. when she did

---

[13]    The Family Evaluation is partially based on the CCCC's interview of G.G. The CCCC did not interview K.G. because he did not respond to its attempts to contact him.

8

not want to smoke synthetic marijuana with him, and they had prenatally exposed K.W.G. to synthetic marijuana. In regard to the family's home, G.G. admitted that it was infested with bed bugs and maggots.

The trial court also admitted into evidence a Child Advocates "Court Report," which contains the recommendation that the children remain in their current foster care placement and all parental rights be terminated. In regard to K.G., the Court Report reveals that he had not "demonstrated an ability to provide a safe and stable environment for his children and ha[d] not completed his [FSP]." He had not been "compliant with individual counseling, domestic[-]violence counseling, [or] drug treatment." And he had continued to test positive for narcotics use, including on October 27, 2015 when he tested positive for the use of "K2-Spice" and cocaine. Because of his continued positive narcotics-test results, K.G.'s visits with the children were suspended.

In regard to K.R.G., the Court Report reflects that he is doing very well in his current placement. He is participating in speech therapy in order to address the delays in his speech, which are improving. Although K.R.G. had adjusted well to his foster home, he, after supervised visits with G.G. and K.G., would "become more defiant" in his foster home and "it [would] take[] about a week or so for []his behavior to settle down." In regard to K.W.G., he is also doing well in his current placement. K.W.G. is happy, current on his immunizations, and is "meeting all of

9

his milestones." Moreover, the children's foster parents would like to adopt both children.

Finally, K.G. testified that he did not want his parental rights to be terminated. Drugs had been "administered" to him while he was in the hospital. And he had admitted to Waters that he, in October or November 2015, had "smoke[d] some K2" and taken "some type of pill." K.G. also noted that G.G. had broken his nose in July 2015.

## Standard of Review

A parent's right to "the companionship, care, custody, and management of" his children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20.  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate.  *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.*  In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted).  However, this does not mean that we must disregard all evidence that does not support the

11

finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Sufficiency of the Evidence

In three issues, K.G. argues that the trial court erred in terminating his parental rights to K.R.G. and K.W.G. because the evidence is legally and factually insufficient to support the trial court's findings that he engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being, he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children, and termination of his parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (b)(2) (Vernon Supp. 2016).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the children. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

*Endangering Conduct*

In his first issue, K.G. argues that the evidence is legally and factually insufficient to support termination of his parental rights to K.R.G. and K.W.G. under section 161.001(b)(1)(E) because "DFPS failed to prove that the endangerment of the children's physical and emotional well-being was the direct result of [his] conduct."

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Within the context of subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Id.* (internal quotations omitted); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted).

It is not necessary to establish that a parent intended to endanger the children in order to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (neglect, even in absence of physical abuse, may

14

endanger children's physical or emotional well-being). However, termination under subsection E requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The specific danger to the children's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the children and they suffer no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). And courts may consider parental conduct that did not occur in the children's presence, including conduct before the children's birth and after they have been removed by DFPS. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 616–17.

Here, the evidence shows that K.G. has an extensive history of narcotics use. K.G. had used narcotics throughout his entire relationship with G.G., and according to Waters, K.G. has a "drug problem." G.G. testified that K.G. began using "K2 or spice" in 2011, his narcotics use had become "worse[] and worse[]" over time, and he would become angry with G.G. when she did not want to smoke synthetic marijuana with him. The Family Evaluation also notes that during G.G. and K.G.'s three-year relationship, K.G. had sold narcotics and used synthetic marijuana and ecstasy.

Further, during the pendency of the instant case, K.G. repeatedly tested positive for narcotics use. Waters testified that K.G. tested positive for the use of "K2 slash spice" in August and September 2015; "K2 spice" and cocaine on October 27, 2015; marijuana, amphetamines, and methamphetamines on March 1, 2016; and benzodiazepine on March 30, 2016—approximately two months before trial.[14] And the narcotics-test results admitted into evidence show that K.G. tested positive for the use of "K2 Spice," benzodiazepines, alprazolam metabolite, and marijuana in September 2015; benzoylecgonine, cocaine, marijuana, amphetamine, and methamphetamine in December 2015; and marijuana in March 2016. Further, the Court Report notes that K.G. did not comply with a narcotics-treatment program,[15] and his visits with his children were suspended due to his continued positive narcotics-test results.

Moreover, K.G. admitted to Waters that he, in October or November 2015, had "smoke[d] some K2" and taken "some type of pill." And K.G.'s criminal records reveal that on January 12, 1999, he was convicted of committing the felony offense of delivery of a controlled substance, namely cocaine, weighing less than

---

[14]    The Court Report also notes that K.G. continued to test positive for narcotics use throughout the instant case.

[15]    Waters similarly noted that K.G. had not completed his required substance-abuse counseling.

one gram;[16] on July 13, 2010, he was convicted of committing the felony offense of possession of a controlled substance, namely cocaine, weighing more than four grams but less than 200 grams;[17] and on April 4, 2011, he was convicted of committing the felony offense of delivery of a controlled substance, namely cocaine, weighing less than one gram.[18]

"As a general rule, conduct that subjects . . . child[ren] to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child[ren]." *In re R.W.*, 129 S.W.3d at 739. And illegal narcotics use and its effect on an individual's ability to parent may constitute an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re A.A.M.*, 464 S.W.3d at 426–27. Notably, illegal narcotics use creates the possibility that a parent will be impaired or imprisoned, and thus, incapable of parenting, supporting termination of parental rights under subsection E. *In re A.A.M.*, 464 S.W.3d at 426–27; *Walker*, 312 S.W.3d at 617–18; *see also In re M.R.R.*, No. 10-15-00303–CV, 2016 WL 192583, at \*5 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) ("A parent's continued drug

---

[16]     *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.112(a)–(b) (state-jail felony offense).

[17]     *See id.* §§ 481.102(3)(D), 481.115(a), (d) (second-degree felony offense).

[18]     *See id.* §§ 481.102(3)(D), 481.112(a)–(b) (state-jail felony offense). Jones, by affidavit, also testified that on July 9, 2007, K.G. was convicted of committing the felony offense of delivery of a controlled substance.

use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.").

The trial court could have reasonably found that K.G.'s continued narcotics use and selling of narcotics qualified as a continuing course of conduct that subjected K.R.G. and K.W.G. to a life of uncertainty and instability, thereby endangering their physical and emotional well-being. *See In re A.A.M.*, 464 S.W.3d at 426–27 ("[T]he trial court reasonably could have concluded that the [parent's] continued pattern of drug use, even after [DFPS]'s involvement, displayed a voluntary, deliberate, continued, and conscious course of endangering conduct."); *Walker*, 312 S.W.3d at 617–18 ("Evidence of narcotics use and its effect on a parent's life and ability to parent may establish that the parent has engaged in an endangering course of conduct.").

Additionally, "evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child[ren]." *In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence"). Although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may

18

support a finding of endangerment. *In re T.M.*, No. 14-14-00948-CV, 2015 WL 1778949, at *4 (Tex. App.—Houston [14th Dist.] Apr. 16, 2015, no pet.) (mem. op.); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (recognizing parent's imprisonment demonstrated deliberate course of conduct qualifying as endangering conduct). If the imprisonment of the parent reflects a voluntary, deliberate, and conscious course of conduct, it qualifies as conduct that endangers the children. *See Walker*, 312 S.W.3d at 617; *see also In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("An environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed . . . endangers both the physical and emotional well-being of a child.").

Here, the record reveals that on January 12, 1999, K.G. was convicted of committing the felony offense of delivery of a controlled substance, namely cocaine, weighing less than one gram, and sentenced to confinement for one year;[19] on January 27, 2004, K.G. was convicted of committing the misdemeanor offense of evading arrest;[20] on July 9, 2007, K.G. was convicted of committing the felony offense of delivery of a controlled substance; on July 13, 2010, K.G. was convicted of committing the felony offense of possession of a controlled substance, namely cocaine, weighing more than four grams but less than 200 grams, and sentenced to

---

[19] *See id.* §§ 481.102(3)(D), 481.112(a)–(b) (state-jail felony offense).

[20] *See* TEX. PENAL CODE ANN. § 38.04(a)–(b).

confinement for two years;[21] and on April 4, 2011, K.G. was convicted of committing the felony offense of delivery of a controlled substance, namely cocaine, weighing less than one gram, and sentenced to confinement for two years.[22] Further, although the case was ultimately dismissed, a Harris County grand jury, on May 18, 2010, issued a true bill of indictment, accusing K.G. of unlawful possession of a firearm by a felon.[23]

Although K.G.'s convictions and terms of imprisonment occurred prior to the births of the children, "courts look to what [a] parent did both before and after the child[ren]'s birth[s] to determine whether termination [of parental rights] is necessary." *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *see also Walker*, 312 S.W.3d at 617 (criminal offenses occurring before child born still considered "as part of a voluntary, deliberate, and conscious course of conduct" having effect of endangering child); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (fact finder "may infer from past conduct . . . that similar conduct will recur"). And conduct that routinely subjects children to the probability that they will be left alone because a parent is jailed endangers both the physical and emotional well-being of the children. *Walker*, 312 S.W.3d at 617; *see*

---

[21]     *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.115(a), (d) (second-degree felony offense).

[22]     *See id.* §§ 481.102(3)(D), 481.112(a)–(b) (state-jail felony offense).

[23]     *See* TEX. PENAL CODE ANN. § 46.04(a), (e) (third-degree felony offense).

*also In re T.G.R.-M.*, 404 S.W.3d. 7, 14–15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (considering "charges stemming from . . . two arrests [that] were ultimately dismissed" and noting each time parent confined "she was absent from [child's] life and was not able to provide for [child's] physical and emotional needs"). Further, courts have routinely recognized that a parent's narcotics use, and the imprisonment relating to it, harm the physical and emotional well-being of children and the parent-child relationship. *See In re A.A.M.*, 464 S.W.3d at 426–27.

The record also reflects that K.G. has exhibited extensive violent and abusive behavior toward both G.G. and K.R.G. Jones, by affidavit, testified that DFPS received a report that when G.G. arrived at the hospital because of issues related to her pregnancy with K.W.G., she had scars on her face caused by "domestic altercations" between herself and K.G. And during the course of DFPS's investigation, G.G. admitted that domestic violence had occurred between herself and K.G. and K.G. had hit her, including while she was pregnant. Jones further noted that on July 8, 2015, when she arrived at K.G.'s home, "the blinds [were] completely torn off of the window . . . and there were small blood spatters on the floor." G.G. told her that she and K.G. had argued, and Jones saw "multiple bruises on [G.G.'s] upper and lower arms that appeared [to be] fresh," "multiple scratches on her face[,] and a large laceration on [her] right cheek."

Waters similarly testified that when G.G. arrived at the hospital because of pregnancy complications, she had "bruising on her face" that was the result of domestic violence in the home. K.G. physically abused G.G., and the physical abuse occurred throughout her entire relationship with him. Waters opined that at the time of trial, neither G.G. nor K.G. had demonstrated an ability to resolve the "domestic violence issues" that occurred between them.

G.G. testified that K.G. is abusive toward her, had previously broken her arm, and she has "a lot of scars on [her] face and bruises." K.G. first hit G.G. when she was pregnant with K.R.G., and the abuse continued until DFPS took custody of the children. K.G. had previously told her that "he would kill [her], find [her], and kill [her]" if she left the home that she had shared with him. The medical records from G.G.'s hospital visit also indicate that K.G. began physically and verbally abusing G.G. as early as six months into their more than three-year relationship, and she had sustained scars as a result of the abuse, which occurred daily. And G.G. further reported to hospital personnel that K.G. had previously "head-butted her in the face, causing her lip to split open," and screamed and cursed at K.R.G.

The Family Evaluation notes that K.G. had been physical and verbally abusive toward G.G. He had broken her arm, "head-butted her," "threatened to kill her," and "choke[d] her until she couldn't breathe." K.G. first slapped G.G. after they had been together for one year because he did not want her to "go out with her friends."

22

He then became "more and more physically abusive, hitting [G.G.] about every other day." K.G. was controlling and had previously "left a mark" on K.R.G.'s back.[24]

A parent's abusive or violent conduct can produce an environment that endangers the children's well-being. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet). While direct physical abuse clearly endangers children, domestic violence, want of self-control, and a propensity for violence may also be considered as evidence of endangerment. *See In re I.J.A.*, No. 04-09-00787-CV, 2010 WL 2403728, at *4 (Tex. App.—San Antonio June 16, 2010, no pet.) (mem. op.); *In re J.I.T.P.*, 99 S.W.3d at 845; *see also Sylvia M. v. Dall. Cty. Child Welfare Unit of Tex. Dep't of Human Servs.*, 771 S.W.2d 198, 201–04 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage and altercation during pregnancy); *In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (considering father's lack of self-control and propensity for violence and aggression).

Further, courts have routinely considered evidence of parent-on-parent physical abuse in termination cases without requiring evidence that the conduct result in a criminal conviction. *See In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—

---

[24] The record also reflects that K.G. did not successfully complete his anger-management classes or his domestic-violence training.

23

Texarkana 2003, no pet.) (father physically abused child's mother); *Spangler v. Tex. Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 260 (Tex. App.—Waco 1998, no pet.) ("A parent's abuse of a spouse can suffice to support termination of the abuser's parental rights."); *Allred v. Harris Cty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (father physically abused mother while she was pregnant); *see also In re DC*, No. 01-11-00387-CV, 2012 WL 682289, at *9–11 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. denied) (mem. op.) (mother's testimony father physically and mentally abused her supported parental termination under subsection (E)). And evidence that a parent has engaged in abusive or violent conduct in the past permits an inference that he will continue his violent behavior in the future. *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that K.G. engaged, or knowingly placed K.R.G. and K.W.G. with persons who engaged, in conduct that endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

We overrule K.G.'s first issue.[25]

---

[25] Having held that the evidence is legally and factually sufficient to support the trial court's finding under Texas Family Code section 161.001(b)(1)(E), we need not address K.G.'s second issue challenging the trial court's finding under section 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *Walker v. Tex.*

24

***Best Interest of Children***

In his third issue, K.G. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the best interest of K.R.G. and K.W.G. because the evidence presented at trial was "unconvincing, lacking in factual bases and manifestly conclusory to prove best interest."

In determining whether the termination of K.G.'s parental rights is in the best interest of K.R.G. and K.W.G., we may consider several factors, including: (1) the children's desires; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The *Holley* factors are not exhaustive, and there is no

---

*Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. R. APP. P. 47.1.

requirement that DFPS prove all factors as a condition precedent to the termination of parental rights.[26] *See In re C.H.*, 89 S.W.3d at 27.

In regard to the children's current and future physical and emotional needs, K.G. has not demonstrated that he is capable of providing "a safe and stable environment" for K.R.G. and K.W.G. Before DFPS took custody of the children, they lived in a home that contained no food[27] and was "very dirty" and unsanitary. The home was infested with bed bugs and maggots. Jones testified that on the day that DFPS took custody of the children, she saw them in K.G.'s home, which was "trashed." At that time, "the blinds [in the home were] completely torn off of the window, trash was near the door of the home, clothing was scattered around in piles, dirty dishes were in the sink, and there were small blood splatters on the floor."

There is also extensive evidence in the record regarding the physical and verbal abuse of G.G. by K.G. and the domestic violence that occurred between them in the home. Waters opined that at the time of trial, K.G. had not demonstrated an ability to cease the "domestic violence issues" that occurred between himself and G.G. And Waters testified that the children were in need of permanency, which they had been lacking. The Court Report also notes that K.R.G. needs therapy to address

---

[26]     We note that there is no evidence in the record regarding the children's desires.

[27]     K.G. reportedly "hoard[ed]" any food in the family's home for himself, and G.G. had to take K.R.G. to her mother's home for him to eat.

delays in his speech. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12)(D), (E) (Vernon Supp. 2016) (considering history of abusive or assaultive conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (parent's history of failing to provide children with stable and nurturing environment demonstrates termination of parental rights in best interest of children); *see also In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *10–11 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (mother did not demonstrate she could provide safe and stable home).

In regard to the current and future emotional and physical danger to K.R.G. and K.W.G., Waters testified that DFPS took custody of the children after G.G., while pregnant with K.W.G., arrived at the hospital with "bruising on her face," which was the result of domestic violence in the family's home. K.G. physically abused G.G. and hit her, including while she was pregnant. G.G. testified that K.G. is abusive toward her, had previously broken her arm, and she has "a lot of scars on [her] face and bruises." K.G. also threatened to kill G.G. if she left the home that

27

she had shared with him. And G.G.'s medical records indicate that K.G. reportedly began physically and verbally abusing G.G. six months into their more than three-year relationship, and G.G. had sustained scars as a result of the abuse, which occurred daily. Further, G.G. reported to hospital personnel that K.G. had previously "head-butted her in the face, causing her lip to split open," and screamed and cursed at K.R.G. G.G. also described the home that she shared with K.G. as a "hell hole." And the Family Evaluation notes that K.G. had been physically and verbally abusive toward G.G., broken her arm, "head-butted her," "threatened to kill her," and "choke[d] her until she couldn't breathe." K.G. hit G.G. "about every other day" and had previously "left a mark" on K.R.G.'s back.

K.G. also has an extensive history of narcotics use. For instance, Waters testified that K.G. has a "drug problem," and G.G. noted that he began using "K2 or spice" in 2011 and his narcotics use had become "worse[] and worse[]" over time. The Family Evaluation states that K.G. had sold narcotics and used synthetic marijuana and ecstasy during his three-year relationship with G.G. Further, K.G. continued to test positive for narcotics use during the pendency of the instant case, including in August 2015, September 2015, October 2015, December 2015, and twice in March 2016. And the Court Report notes that K.G.'s visits with his children were suspended due to his continued positive narcotics-test results. K.G. even admitted to Waters that he had "smoke[d] some K2" in October or November 2015

28

and taken "some type of pill." *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (8), (12)(D), (E) (considering history of abusive or assaultive conduct and substance abuse by child's family, ability to provide safe home environment, and ability to protect child from repeated exposure to violence); *In re B.J.*, 2016 WL 1389054, at *11 (noting mother's continued narcotics use in determining current and future emotional and physical danger to children); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (considering parent's narcotics use in analyzing present and future emotional and physical danger to children); *In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.— Fort Worth 2006, no pet.) (considering parent's violent tendencies and narcotics use in determining current and future emotional and physical danger to children).

Waters further testified that K.G. had a criminal record, which included multiple convictions for committing the offenses of delivery of a controlled substance and possession of cocaine. And, as previously noted, the evidence of K.G.'s criminal record reveals that he was convicted of committing criminal offenses, including multiple felony offenses, mostly related to narcotics in 1999, 2004, 2007, 2010, and 2011 and sentenced to various terms of confinement in connection with those convictions. *See In re B.J.*, 2016 WL 1389054, at *12 (considering mother's significant criminal record in assessing present and future emotional and physical danger to children); *In re T.L.S.*, 2012 WL 6213515, at *6

(considering parent's criminal history in determining present and future emotional and physical danger to children); *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("[E]vidence of past misconduct or neglect can be used to measure a parent's future conduct.").

In regard to K.G.'s parental ability, the record reveals that at the time DFPS took custody of K.R.G. and K.W.G., they had been living in a home that was unsanitary, unsafe, infested with bed bugs, had maggots "running around on [its] floor[s]," and no food. The little food that was in the home, K.G. reportedly "hoard[ed]" for himself. When Jones visited K.G.'s home on July 8, 2015, she found that it was "trashed," "the blinds [were] completely torn off of the window," trash was on the floor, "clothing was scattered around in piles, dirty dishes were in the sink, and there were small blood splatters on the floor." She also found G.G. with "multiple bruises on her upper and lower arms that appeared fresh," "multiple scratches on her face[,] and a large laceration on [her] right cheek."

The Court Report notes that K.G. had not "demonstrated an ability to provide a safe and stable environment for his children," and the Family Evaluation states that K.G. had previously "left a mark" on K.R.G.'s back. G.G. reported to hospital personnel that K.G. screamed and cursed at K.R.G. And the record indicates that K.G. continued to use narcotics throughout the pendency of the instant case and did not complete the services required by his FSP. K.R.G. also suffered from a speech

delay at the time DFPS took custody of him. *See* TEX. FAM. CODE ANN. § 263.307(b)(3), (7), (8), (12)(D), (E) (considering parent's ability to provide safe home environment, harm to child, history of abusive or assaultive conduct and substance abuse by child's family, and ability to protect child from repeated exposure to violence); *In re B.J.*, 2016 WL 1389054, at *12 (considering children's developmental delays, lack of safe or stable home, and narcotics use when determining parental ability); *In re J.J.G.*, No. 14-15-00094-CV, 2015 WL 3524371, at *7 (Tex. App.—Houston [14th Dist.] June 4, 2015, no pet.) (mem. op.) (when determining parental ability, considering "past performance as a parent," narcotics use, lack of stable employment, and failure to comply with court-ordered services).

In regard to programs available to assist K.G., Waters testified that although K.G. had submitted to a psychosocial examination, completed a psychiatric examination, submitted to a substance-abuse assessment, and attended parenting classes, he had not completed all of the services required by his FSP, including substance-abuse counseling, domestic-violence training, and anger-management classes. In fact, K.G. had been "unsuccessfully discharged" from his domestic-violence training and anger-management classes because he had missed too many sessions and had not paid for them. The Court Report also notes that K.G. failed to complete his FSP and was not "compliant with individual counseling, domestic[-]violence counseling, [or] drug treatment." *See In re B.J.*, 2016 WL

31

1389054, at *12 (mother did not perform all of her services required by FSP); *In re T.L.S.*, 2012 WL 6213515, at *7 (considering whether parent completed all required services under FSP).

In regard to the stability of the proposed placement and the plans for K.R.G. and K.W.G., Waters testified that the children are currently together in an adoptive foster home. The children have bonded with their foster parents, who would like to adopt them. Plummer similarly testified that K.R.G. and K.W.G. are thriving with their foster parents, the foster-home environment is "[v]ery positive," and the children's behavior has improved since being placed in their foster home. Further, the Court Report states that K.R.G. is doing very well in his current placement, is participating in speech therapy, and has adjusted well to his foster home. In regard to K.W.G., the Court Report notes that he is also doing well, is happy, current on his immunizations, and "meeting all of his milestones." *See* TEX. FAM. CODE ANN. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination); *see also In re B.J.*, 2016 WL 1389054, at *13 (children doing well in their placements and noting positive improvements since entering foster homes); *In re T.A.S.*, No. 05-15-01101-CV, 2016 WL 279385, at *6 (Tex. App.—Dallas Jan. 22, 2016, no pet.) (mem. op.)

(considering children's improvement in foster care and noting they had "stabilized and [were] functioning well in . . . foster home").

In regard to acts or omissions that may indicate that the parent-child relationship is not proper, a parent's use of narcotics, inability to provide a stable home, and failure to comply with his FSP support a finding that termination of his parental rights is in the best interest of the children. *In re S.B.*, 207 S.W.3d at 887–88. As discussed above, there is ample evidence that K.G. did use, and continued to use during the pendency of the instant case, narcotics, was unable to provide a safe and stable home for K.R.G. and K.W.G., and failed to comply with the terms of his FSP. *See In re B.J.*, 2016 WL 1389054, at \*13 (mother continued to use narcotics, could not provide stable home, and did not comply with her FSP).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of K.G.'s parental rights is in the best interest of K.R.G. and K.W.G. And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of K.G.'s parental rights is in the best interest of K.R.G. and K.W.G. We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of K.G.'s parental rights is in the children's best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed

a firm belief or conviction that termination is in the best interest of K.R.G. and K.W.G.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of K.G.'s parental rights is in the best interest of the children.

We overrule K.G.'s third issue.

**Conclusion**

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Bland.